# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | Jeffrey Gilbert |
|---|---|---|---|
| **CASE NUMBER** | 12 C 752 | **DATE** | 10/5/2012 |
| **CASE TITLE** |  | Morado vs. City of Chicago et al | |

**DOCKET ENTRY TEXT**

Motion hearing held on 10/3/12 on Defendants' Motion to Compel [95] and Defendants' Second Motion to Compel [114]. The Court reserved ruling at the end of that hearing on Defendants' request that Plaintiff be required to produce eight months of video surveillance tapes preserved on a back-up hard drive. The Court now grants in part and denies in part Defendants' Motions [95, 114] as to certain of those video surveillance tapes. (See Statement below for further details.)

■[ For further details see text below.]  .Notices mailed by Judicial staff.

# STATEMENT

1. Plaintiff shall produce on or before 10/12/12 the video surveillance tapes that have been preserved on a back-up hard drive for the time period from December 1, 2010 through and including May 31, 2011. Plaintiff is not required to produce the tapes covering the time period beyond May 31, 2011, at this time.

2. The Court finds that these tapes contain information that is relevant to the claims and defenses in this case or appears reasonably likely to lead to the discovery of admissible evidence at least with respect to (a) police activity in the vicinity of Plaintiff's home in a case in which Plaintiff alleges that she and her family have been harassed by Defendant police officers during the time period captured by the video tapes (Pl's Second Amended Complaint [55] at ¶¶23-30), and (b) the comings and goings of Plaintiff's son, John Doe, in a case in which such activity is made relevant at least by Plaintiff's allegation in her Second Amended Complaint that "[a]s a result of the repeated and constant harassment, Plaintiff does not allow her son outside the home alone. He is not allowed to socialize with friends outside the home for fear he will be falsely arrested by Defendant Handzel or other 8th District police officers." [*Id*. at ¶39].

3. Further, Plaintiff's own conduct supports the notion that the tapes contain relevant information or reasonably may lead to the discovery of admissible evidence. Fed.R.Civ.P. 26(b)(1). Plaintiff's counsel estimates that Plaintiff already has turned over between 10 and 20 video clips filmed in December 2010. Defendants say Plaintiff has produced "approximately twelve clips" filmed in December 2010. [114 at pp.2-3] In addition, Plaintiff took affirmative steps to back-up approximately eight months of video surveillance tapes beginning with tapes created in December 2010, thus ensuring that tapes covering that time period would be preserved and not re-recorded in the ordinary course of the video surveillance system's continuous loop every two weeks. ("The Morados have a

**STATEMENT**

home surveillance system that can only store two weeks worth of video at a time.") [Plaintiff's Opposition Br. [125] at p.4].

4. The period of time covered by these specifically preserved video surveillance tapes overlaps with the log Plaintiff and her mother began to keep in September 2010 that contains detailed descriptions of events that allegedly occurred between April 28, 2010 and May 25, 2011, including alleged police activity and harassment in the vicinity of Plaintiff's home. Plaintiff subsequently turned that log over to her attorneys, and the Court ordered the log produced to Defendants at the hearing held on Defendants' Motions on October 3, 2012 [127]. Accordingly, there is a fair inference that Plaintiff backed-up and preserved these particular video surveillance tapes because she believed they might contain relevant information relating to the claims that ultimately were brought in this lawsuit.

5. Although Plaintiff maintains that she has produced all of the video clips from the surveillance tapes in her possession that she intends to introduce into evidence, Defendants are entitled to review the tapes for other evidence they may use in their case or to contest Plaintiff's case. In particular, Defendants contend the tapes may show police activity in the vicinity of Plaintiff's home on a regular basis not because Defendants are harassing Plaintiff but because Plaintiff's home is located across from a park to which police regularly are dispatched. Defendants contend this evidence may be relevant or reasonably lead to admissible evidence that could blunt or undercut Plaintiff's contention that the presence of Defendant police officers outside or in the vicinity of her home was intended to harass and intimidate Plaintiff and her family. (Pl's Second Amended Complaint [55] at ¶¶23-30) Whether or not the evidence on the tapes is susceptible to the interpretation Defendants would place on it, or instead would support Plaintiff's claims, the Court is convinced the information is at least discoverable at this juncture.

6. Defendants also seek to challenge or mitigate Plaintiff's allegation that she does not allow her son outside the house and that he is not allowed to socialize with friends outside the home for fear he will be arrested. (Pl's Second Amended Complaint [55] at ¶39) Video cameras that are sensitive enough to be triggered by a leaf blowing across the lawn, as Plaintiff says the cameras are here, very well may have captured John Doe coming out of or going into his home, alone or in the company of others, and any activity he engaged in outside his home within reach of the video cameras. Therefore, it is very possible and even likely that the tapes contain material that is relevant or that reasonably could lead to the discovery of admissible evidence. Again, whether the evidence ultimately supports or undercuts Plaintiff's claims or Defendants' defenses, or is admissible at trial, is beyond the scope of the Court's determination that the evidence at least is discoverable at this time.

7. Finally, in addition to the kinds of evidence described above, it is possible that the video surveillance tapes contain other material that is relevant or reasonably likely to lead to the discovery of admissible evidence in a case that centers on whether Defendants, for example, conducted a "campaign to drive Plaintiff and her family from his neighborhood," "participated in a continuing pattern of harassment of John Doe," and whether one of the Defendant police officers "parked on Plaintiff's block and placed her home and her family under surveillance, without legal justification." (Pl's Second Amended Complaint [55] at ¶¶23, 24, 27).

8. Although video surveillance back-up tapes apparently exist for a period of time extending beyond May 31, 2011, potentially into July or August 2011, the Court is limiting production to the tapes covering the period ending on May 31, 2011 because the last concrete event alleged in Plaintiff's

**STATEMENT**

Second Amended Complaint occurred on May 10, 2011, and the last event recorded in Plaintiff's log of activity occurred on May 25, 2011.

9. While Plaintiff's Second Amended Complaint alleges that "[s]ince April 28, 2010 and continuing to the present, Defendant Hanzel, and other 8th District Chicago Police Officers have participated in a continuing pattern of harassment of John Doe" (Pl's Second Amended Complaint [55] at ¶24), which arguably puts in issue the entire period of time captured on the video tapes Plaintiff has preserved on a hard drive, these more general allegations do not, in the Court's view, justify the production of tapes for a period of time that extends much beyond the date in May 2011 that Plaintiff stopped making entries in her log (May 25, 2011) and the last specific date on which Plaintiff alleges police harassment or activity occurred in the vicinity of her home (May 10, 2011) in her Second Amended Complaint (Pl's Second Amended Complaint [55] at ¶¶31-37).

10. Further, in cutting off production of the back-up tapes at May 31, 2011, rather than ordering production of the full eight months of back-up tapes, the Court is balancing the likelihood that the tapes that are produced will contain relevant information or reasonably lead to the discovery of admissible evidence against the expense and potential burden on the parties, and potential delay of the proceedings in this case, entailed in reviewing what Plaintiff says are approximately 500,000 video clips at the close of the discovery period and with less than two months remaining before the parties' pretrial order is due.

11. The Court also notes, in passing, that it does not know precisely, and neither may Plaintiff, how many individual video clips are preserved on the hard drive. Plaintiff's daughter testified that the surveillance tapes contain "way over 10,000 videos" (Deposition Transcript [114-1] at Ex. B) which, though still a substantial number, is a far cry from Plaintiff's counsel's estimate of approximately 500,000 videos (Plaintiff's Opposition Br. [125] at pp.3-4). It is unclear, however, whether Plaintiff's daughter was speaking of the videos on the approximately eight months of back-up tapes preserved on the hard drive or the number of video clips that ordinarily are contained on the regular loop of surveillance tapes for a two-week period. In any event, cutting off production at May 31, 2011, likely will provide Defendants with the surveillance tapes covering the time period most relevant to the claims and defenses in this case.

12. The tapes shall be produced as "attorneys' eyes only" ("AEO") documents. Because the existing confidentiality order in this case [88] does not contain an AEO designation, the parties shall submit for entry by the Court on or before 10/11/12 a confidentiality order containing an AEO designation. The confidentiality order shall include a provision that any video tapes that are referenced in court filings be filed under seal and provide that the tapes produced be returned to Plaintiff at the conclusion of this litigation. If the parties cannot agree to the terms of an AEO confidentiality order, they shall submit their respective dueling versions of an AEO order to the Court by noon on 10/11/12.

13. In light of Plaintiff's delay in disclosing the existence of these video surveillance back-up tapes, and because the tapes will be produced as AEO under an appropriate confidentiality order, the Court will not allow Plaintiff's counsel more time than is permitted before 10/12/12 to review the tapes prior to production of the hard drive (or a copy of it) to Defendants. As late as August 12, 2012, Plaintiff's counsel represented in writing to Defendants' counsel that "[t]he retained recorded footage from Plaintiff's home video camera has already been turned over to Defendants pursuant to Defendants' earlier discovery requests. . . All footage that was manually saved in the Plaintiff's computer already

**STATEMENT**

has been disclosed to Defendants." [114-1] at Ex. D.  Had Plaintiff disclosed the existence of the hard drive containing a back-up of months of video surveillance tapes earlier in the litigation, counsel and the Court conceivably could have instituted a procedure that might have allowed for more pre-production review of the tapes.  But Plaintiff's failure to disclose the existence of this evidence in a timely fashion coupled with the fast approaching discovery cut-off deadline, firm dates for filing dispositive motions and a pre-trial order, and placement of this case on the District Judge's December trial calendar deprives this Court and the parties of the luxury of time.

14. Further, Plaintiff is unlikely to be prejudiced by being required to produce the video tapes in a week as AEO material.  It is extremely unlikely the tapes contain any privileged information that would be culled before they are produced.  Moreover, the Court does not find the possibility that activity captured on the video tapes might be considered sensitive or even embarrassing by Plaintiff outweighs the need to produce the tapes as soon as possible as discovery in this case draws to a close.  The AEO nature of the production also mitigates Plaintiff's expressed concern with producing to Defendant police officers a video depiction of all activity outside her home for an eight month time period.  In addition, the surveillance cameras that produced the video tapes film activity occurring exclusively outside Plaintiff's house and thus in public view.  Accordingly, there is minimal concern that disclosure of the activity captured on film would implicate any privacy interests that would be subject to legal protection, particularly for family members who know the surveillance cameras exist and are aware that filming is triggered by any movement outside the house, even, according to Plaintiff, a leaf blowing across the front yard.

15. Further, nothing in this Court's order requiring production of the video surveillance back-up tapes because they contain discoverable information is intended to presage a ruling that any of the material captured on these tapes is admissible under the Federal Rules of Evidence at any trial of this case or for purposes of summary judgment practice.

16. Accordingly, for all of these reasons, Defendants' Motion to Compel [95] and Defendants' Second Motion to Compel [114] are granted in part and denied in part with respect to the video surveillance tapes backed-up on a hard drive in Plaintiff's possession.

It is so ordered.